# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                      No. CR 15-1019 JB

NORA ASUSENA AMADOR-BELTRAN,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Nora A. Amador-Beltran's Motion to Suppress Evidence Due to Violation of the Fourth Amendment, filed May 3, 2015 (Doc. 18)("Motion").  The Court held an evidentiary hearing on June 26, 2015.  The primary issues are: (i) whether the Court should suppress evidence of the narcotics that Drug Enforcement Administration Agent Jarrell Perry found in Amador-Beltran's sweater; (ii) whether Amador-Beltran freely and voluntarily handed Perry her sweater that contained hidden packages of illegal narcotics; and (iii) if she did voluntarily hand Perry her sweater, whether her consent to search her sweater included consent to search all items found inside the sweater.  Based on the totality of the circumstances indicating that Perry's behavior was not coercive, the Court concludes that Amador-Beltran freely and voluntarily handed Perry her sweater, and that she did not limit her consent to exclude items wrapped inside the sweater.  Accordingly, the Court denies Amador-Beltran's motion and will not suppress the illegal narcotics Perry found inside her sweater.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Raddatz, 447 U.S. 667, 679 (1980)(noting that "the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself"); United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)("The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)[1]("We need not resolve whether Crawford[ v.

---

[1] United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

Washington, 541 U.S. 36 (2004)]'s[2] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"), cert. denied, 130 S. Ct. 223 (2009); United States v. Merritt, 695 F.2d at 1269; United States v. Christy, No. 10-1534, 2011 WL 3933868, at *2 (D.N.M. Sept. 2, 2011)(Browning, J.)("Thus, the Court may consider hearsay in ruling on a motion to suppress."); United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").

1.     On March 11, 2015, Perry was at the Greyhound Bus station in Albuquerque, New Mexico, to meet an eastbound Greyhound bus that was to arrive at 9:55 a.m. and depart at 11:15 a.m.  See Motion at 2; United States' Response to Defendant's Motion to Suppress Evidence Due to Violation of the Fourth Amendment at 2 (Doc. 18), filed June 2, 2015 (Doc. 31)("Response"); Transcript of Hearing at 6:20-7:7 (taken June 26, 2015), filed July 10, 2015 (Doc. 44)("Tr.")(Long, Perry).

2.     Perry was dressed in plain clothes with no visible weapons.  See Tr. at 7:9-16 (Long, Perry).

---

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Garcia has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

[2]Crawford v. Washington decided that out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross-examine the witness.  See 541 U.S. at 53-54.

3.      As passengers boarded the bus after their layover, Perry initiated several conversations with the passengers.  See Transcript of Consensual Encounter Recording (dated March 11, 2015), filed June 2, 2015 (Doc. 31-1)("Recording"); Tr. at 12:7-23 (Long, Perry).

4.      As he spoke to the first two unknown male passengers, Perry stood in the aisle in front of Amador-Beltran's seat.  See Motion at 2; Tr. at 13:2-5 (Perry).

5.      Perry and the unknown male passenger he was interviewing moved out of the way to allow Amador-Beltran to take her seat.  See Tr. at 13:2-25 (Perry); Recording at 3.

6.      After finishing his encounter with the unknown male, Perry moved to the rear of Amador-Beltran's seat and asked her if he could speak to her.  See Motion at 2; Tr. at 15:1-3 (Perry); Recording at 3.

7.      Amador-Beltran sat in the window seat, leaving the aisle seat open.  See Tr. at 15:1-25 (Perry).

8.      Perry stood "behind the aisle seat that she[] [sat] beside, maybe a little bit in the aisleway, but where people could get by."  Tr. at 15:14-25 (Long, Perry).

9.      Perry asked her how she was doing, and she said: "Good."  Tr. at 16:22-23 (Perry); Recording at 5.  He asked her if she spoke English, and she responded: "A little."  Tr. at 16:23-25 (Perry); Recording at 5.

10.      Perry displayed his badge to the defendant and, in Spanish, identified himself as a police officer, to which Amador-Beltran said: "Okay."  Motion at 2; Tr. at 17:1-5 (Perry); Recording at 5.

11.      Perry is not fluent in Spanish, but has gained a proficiency in interdiction questions and responses from his work over the years.  See Tr. at 17:11-21 (Long, Perry).

12.      Perry asked Amador-Beltran if he could see her ticket and identification, which

Amador-Beltran gave him.  <u>See</u> Motion at 2; Response at 3.

13.     While Amador-Beltran searched for her identification, she appeared nervous and was moving objects around so quickly that some of the objects fell out and onto the floor.  <u>See</u> Tr. at 19:11-18 (Perry).

14.     After inspecting Amador-Beltran's ticket and identification -- both identifying her as "Maricela Llanes" -- Perry returned both the ticket and her identification card.  Motion at 3; Tr. at 18:4-19:8 (Long, Perry); Recording at 5-6.

15.     Perry then asked if she had any luggage with her, to which she responded that she did and pointed at a bag on the floor in front of her feet.  <u>See</u> Motion at 3; Tr. at 20:4-11 (Long, Perry); Recording at 6.

16.     Perry asked Amador-Beltran if he could search her bag for contraband, and Amador-Beltran consented.  <u>See</u> Motion at 3; Recording at 7.

17.     She picked up the bag from the floor and handed it to Perry.  <u>See</u> Tr. at 23:22-23 (Perry).

18.     Perry searched the bag, did not locate any contraband, and returned it to Amador-Beltran immediately.  <u>See</u> Tr. at 24:3-4 (Long, Perry).

19.     Perry then pointed to Amador-Beltran's purse and asked to search it, to which Amador-Beltran responded yes.  <u>See</u> Tr. at 24:9-25:1 (Long, Perry); Recording at 7.

20.     Perry searched the purse, did not locate any contraband, and returned it immediately.  <u>See</u> Tr. at 24:9-25:1 (Long, Perry).

21.     Perry next asked to search Amador-Beltran's pillow, which was "on the right side of the defendant's lap up against the bus wall below the window."  Tr. at 25:6-9 (Perry).  <u>See</u> Recording at 7.

Case 1:15-cr-01019-JB   Document 74   Filed 11/19/15   Page 6 of 27

22.     She responded "yes" in Spanish and handed the pillow to Perry.  See Tr. at 25:17-25 (Long, Perry); Recording at 7; Motion at 3.

23.     When Amador-Beltran removed the pillow, he could see a small portion of a black-colored object that was largely hidden by the defendant's right leg and lower back area.  See Tr. at 26:7-11 (Perry).

24.     Perry squeezed the pillow a few times without opening it and returned it to Amador-Beltran immediately.  See Tr. at 26:23-27:2 (Perry).

25.     He did not realize that other objects were inside the pillow at the time he searched it.  See Tr. at 33:7-11 (Long, Perry).

26.     Perry then asked if he could search her "cobija," which means blanket in Spanish, and indicated that he was talking about the black item behind her right leg that the pillow was covering.  Motion at 3; Tr. at 28:1-2 (Perry); Recording at 8.

27.     She pulled the item out from under her and held it in her hands.  See Tr. at 28:13-16 (Perry).

28.     Amador-Beltran then said, "suéta," which means sweater in Spanish.  Motion at 3; Tr. at 28:17-19 (Long, Perry); Recording at 8.

29.     Perry looked at the black sweater in her hands and said, "Chamarra?" which means jacket.  See Tr. at 28:21-25 (Perry); Recording at 8.

30.     Amador-Beltran said, "yes," and then handed Perry the sweater.  Tr. at 28:24-25 (Perry); Recording at 8.[3]

---

[3]Amador-Beltran argues that Perry must have pulled it out from under her because she would not have handed it to him unless he asked for it.  See Tr. at 106:24-25 (Amador-Beltran). Perry did ask her for it when he asked for the blanket and pointed at the sweater.  See Tr. at 107:1-5 (Court).  Additionally, the recording reveals no signs of a struggle.  See Tr. at 122:24-123:1 (Court); Recording at 8.  Thus, the Court concludes that, by a preponderance of the

- 6 -

31.     Although Perry originally labeled the sweater a jacket, the Court concludes that it is a sweater.  See Photograph of the Sweater (labeled Government Exhibit 7).

32.     By handing the sweater to Perry after she had seen him search the three prior items, Amador-Beltran consented to the search of the sweater.

33.     Perry felt a hard, heavy object inside the sweater's sleeve and saw a blue shaving kit, or fanny pack, tucked in one of the sleeves.  See Tr. at 30:2-6 (Long, Perry).

34.     Although Perry originally labeled the fanny pack a shaving kit, the Court determines that it was a fanny pack.  See Photograph of the Fanny Pack (labeled Government Exhibit 9); Tr. at 30:14-15 (Baiz, Perry)(admitting that what he identified as a shaving kit could also be described as a fanny pack).

35.     He removed the fanny pack, unzipped it, and observed two rectangular-shaped, brick-like bundles that were wrapped in clear plastic and aluminum foil.  See Tr. at 30:16-25 (Long, Perry); Photograph of Opened Fanny Pack (labeled Government Exhibit 10).

36.     Perry knew from his experience that these bundles and packaging were consistent with illegal narcotics, so he handcuffed Amador-Beltran and placed her under arrest.  See Motion at 3; Tr. at 31:1-5 (Long, Perry).

37.     At no point during Perry's encounter with Amador-Beltran did he block her egress from her seat.  See Tr. at 23:6-16 (Long, Perry).

38.     At no point during Perry's search of Amador-Beltran's sweater did she direct him to stop or revoke her consent.  See Tr. at 31:13-25 (Long, Perry).

39.     She did not object to Perry's search either of the sweater or the bag inside of it, and she did not attempt to physically grab the fanny pack or sweater from Perry during his

_____

evidence, Perry asked for the sweater and Amador-Beltran handed it to him.

search.  See Tr. at 31:21-32:2 (Long, Perry).

40.     After Perry transported Amador-Beltran to the DEA, agents conducted a thorough search of all her belongings.  See Tr. at 37:16-19 (Long, Perry).

41.     The substance Perry found in the fanny pack tested positive for the presence of heroin and had a gross weight of 1.2 kilograms.  See Tr. at 37:16-19 (Long, Perry).

42.     In the front zipper compartment of the fanny pack, agents discovered a clear plastic-wrapped bundle.  See Tr. at 38:1-39:17 (Long, Perry).

43.     Further inspection revealed that the bundle contained a Mexican consulate card in the name of Nora Asusena Amador-Beltran and a manila envelope containing $6,400 in all $100 bills.  See Tr. at 38:1-39:17 (Long, Perry).

44.     In addition, agents discovered three small bundles inside Amador-Beltran's purse. See Tr. at 40:14-41:22 (Long, Perry).

45.     They found that one bundle tested positive for the presence of heroin, another for methamphetamine, and the third did not field test positive for the presence of any narcotic.  See Tr. at 40:14-41:22 (Long, Perry).

46.     Perry maintained a conversational tone while speaking to Amador-Beltran, and did not display a weapon or physically restrain or touch the defendant, until he placed her under arrest.  See Tr. at 32:3-18 (Long, Perry); Recording at 3-8; Audio Recording of Perry and Amador-Beltran's Encounter (dated March 11, 2015)("Audio Recording").

47.     Perry did not inform Amador-Beltran that she had the right to refuse any of his requests to search her items.  See Tr. at 42:11-15 (Baiz, Perry).

48.     Although Perry was not fluent in Spanish, the Court concludes that he understood Amador-Beltran's responses and that she understood his requests.

49.    Perry wore a highly sensitive digital recording device around his neck during his encounter with Amador-Beltran.  <u>See</u> Tr. at 7:22-25 (Long, Perry).

50.    The device was sensitive enough to record the sounds of Perry walking and zipping up a jacket.  <u>See</u> Tr. at 9:21-10-11 (Long, Perry).

51.    The Court found that Perry was credible because the recording corroborated his story and no other evidence gave the Court reason to doubt his testimony.  <u>See</u> Tr. at 122:17-19 (Court)(noting that the Court had no "reason not to credit [Perry's] testimony here").

## PROCEDURAL BACKGROUND

On March 24, 2015, a grand jury indicted Amador-Beltran for possession with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). <u>See</u> Indictment at 1, filed March 24, 2015 (Doc. 10).  Amador-Beltran moves to suppress the following information: (i) "[a]ll physical evidence DEA Agents seized from Ms. Amador-Beltran on March 11, 2015 on the Greyhound bus in Albuquerque, New Mexico"; (ii) "[a]ll statements Ms. Amador-Beltran made to DEA agents on March 11, 2015"; and (iii) "[a]ll evidence obtained directly or indirectly as a result of the evidence illegally seized from, and statements made by, Ms. Amador-Beltran."  Motion at 1-2.

She argues that Perry, who was working at the Greyhound bus station on March 11, 2015, searched her bag without consent.  First, she argues that her encounter was not consensual because Perry "simply demanded to see her ticket and identification," and "did not ask for permission to see those."  Motion at 5.  Second, she states that the language barrier prevented her statement to Perry from being specific and unequivocal consent to search her sweater.  She states that Perry asked if he could search her "cobija," which means blanket in Spanish.  Motion at 3. "Agent Perry reached for the item and she said that it was a 'sueda' which means sweater, to

which agent Perry replied with a question 'Sueda?'"  Motion at 3.  Amador-Beltran contends that she replied "yes" in Spanish in response to his question whether the item was a "sueda" -- not in response to his question whether he could search the sweater.  Motion at 3.

She recognizes that an officer does not violate the Fourth Amendment to the Constitution of the United States of America by asking an individual to answer questions, but asserts that the "crucial test" is whether Perry's conduct would have communicated that she was not free to ignore his questions.  Motion at 6.  "A reasonable person in Ms. Amador-Beltran's position cannot be expected to think she could ignore the agent's spoken requests."  Motion at 6.  Thus, she argues that, because she did not validly give consent to search her sweater, Perry's search was unlawful.  See Motion at 4.

The United States responded to Amador-Beltran's Motion on June 2, 2015.  See Response at 1.  The United States asserts that valid consent must: (i) be "unequivocal and specific and freely given;" and (ii) be "given without duress or coercion."  Response at 7 (citing United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007)).  As to the first element, the United States contends that a person may give consent "through nonverbal means."  Response at 7.  It argues that Amador-Beltran "gave unequivocal nonverbal consent to the search" when she handed the sweater to Perry.  Response at 1.  See id. at 7.  "This conduct communicated her consent to the search of the jacket, irrespective of the fact that SA Perry initially described the jacket as a blanket."  Response at 7.  As to the second element, the United States argues that "the totality of the circumstances clearly demonstrates that the defendant's consent was voluntary and not coerced."  Response at 1.  It notes that the "reasonable person standard is an objective test," so even if Amador-Beltran personally felt uncomfortable denying Perry's requests, a reasonable person in her situation would not.  Response at 8-9.

Amador-Beltran replied on June 10, 2015.  <u>See</u> Reply to Government's Response to Motion to Suppress Evidence Due to Violation of the Fourth Amendment, filed June 10, 2015 (Doc. 33)("Reply").  Amador-Beltran argues that the container in which Perry found drugs was a "fanny pack," not a shaving kit, which indicates it is more personal and entitled to a greater right of privacy.  Reply at 2.  She maintains that she did not consent, and argues that if she did, it was coerced.  <u>See</u> Reply at 2-3.  Additionally, she adds that, even if she consented to allowing Perry to search her sweater, the scope of her consent was limited to the sweater and excluded any items he found inside the sweater.  <u>See</u> Reply at 3.

The Court held an evidentiary hearing on June 26, 2015.  At the hearing, Perry testified about his encounter with Amador-Beltran on March 11, 2015.  He emphasized that he maintained a calm demeanor, did not touch Amador-Beltran or show her weapons, and did not block her exit throughout the entire encounter.  <u>See</u> Tr. at 23:6-16 (Long, Perry).  He stated that Amador-Beltran clearly understood that he was asking to search her sweater for several reasons. First, he stated that he had previously asked to search three other items: her bag, her purse, and her pillow.  Each time, Perry stated, Amador-Beltran gave him consent to search the item.  <u>See</u> Tr. at Tr. at 23:6-16 (Long, Perry).  Second, Perry asserted that Amador-Beltran handed him the sweater, indicating her consent to his question whether he could search it.  <u>See</u> Tr. at 28:24-25 (Perry).  Third, Perry stated that he believed "she had no difficulty understanding my questions. She answered them.  She picked up the articles when I asked for consent to search them, handed me the -- the ticket, her ID.  She understood basically all the questions that I asked and responded accordingly."  Tr. at 27:1-6 (Perry).  The United States conceded that, if the search was nonconsensual, the Court would have to suppress the evidence.  <u>See</u> Tr. at 49:18-22 (Court, Long).

On cross-examination, Amador-Beltran questioned Perry's knowledge of Spanish and asked whether he had difficulty understanding the various accents and dialects of Spanish speakers from different countries. See Tr. at 43:1-44:6 (Baiz, Perry). Perry responded: "The specific questions that I ask are generally yes-and-no questions and also questions of where somebody's traveling to. So the questions that I ask, I can understand generally what people -- their answers are . . . no matter what accent they had." Tr. at 44:7-13 (Perry). Amador-Beltran reiterated that Perry "did not get verbal consent" to search her sweater, Tr. at 84:3-5 (Baiz), but Perry maintained that "she said the word 'yes,' so that depends if she's saying the word 'yes' for consent to search it or 'yes' that it's actually a jacket." Tr. at 84:11-14 (Perry). Regardless of the answer, Perry argued that she gave consent by handing him the jacket. See Tr. at 84:15-16 (Perry).

The United States asserted that Amador-Beltran's act of handing Perry the sweater was "very clear nonverbal consent." Tr. at 119:3-6 (Long). It also stated that the recording from Perry's recording device reveals no sign of a struggle over her sweater or anything to indicate that Perry did anything other than inspect the sweater after she handed it to him. See Tr. at 119:16-22 (Long). The Court noted that it had no "reason not to credit [Perry's] testimony here that the defendant handed the jacket to him." Tr. at 122:17-19 (Court). Amador-Beltran conceded that if she had "voluntarily handed it to him without any coercion, yes, I would think that that would be a nonverbal consent." Tr. at 106:10-13 (Baiz).

Amador-Beltran argued that the recording does not show that she consented to search the sweater. The Court noted, however, that the record evidence indicates that she handed Perry the sweater. See Tr. at 105:25-106:4 (Court). The Court asked: "[H]ow else could the sweater have gotten into Mr. Perry's hands without her handing it to him?" Tr. at 106:14-17 (Court).

Amador-Beltran argued that he must have pulled it out from under her because she would not have handed it to him unless he asked for it. See Tr. at 106:24-25 (Amador-Beltran). In response, the Court stated that he asked her for it when he asked for the blanket and pointed at the sweater. See Tr. at 107:1-5 (Court). Moreover, the Court found that the transcript "supports his testimony in the sense that somehow that jacket had to get into his hands." Tr. at 122:24-123:1 (Court). The Court stated that, by a preponderance of the evidence, without sounds of a struggle on Perry's highly sensitive recording, Perry likely gained possession of it after she handed it to him -- just like "she had done with the other items in which she knew that he was going to search them." Tr. at 123:1-5 (Court).

Amador-Beltran also argued that she never consented to a search of the small bag inside her sweater. See Tr. at 107:22-25 (Baiz). She cited United States v. Osage, 235 F.3d 518 (10th Cir. 2000), as supporting her position. She argued that, there, the United States Court of Appeals for the Tenth Circuit held that a police officer went beyond the scope of the consent when he searched sealed cans within a bag that the individual allowed him to search. Amador-Beltran contends that her privacy interest is even greater because the "shaving kit" was actually a fanny pack, which she contends is similar to a purse. Tr. at 110:9-15 (Baiz).

The United States asserted that the scope of consent issue is "foreclosed squarely by [United States v.] Drayton[, 536 U.S. 194 (2002)]." Tr. at 111:12-16 (Long). It argued that Perry's search of the fanny pack was "clearly within the consent provided." Tr. at 111:17-19 (Long). The United States cited United States v. Jackson, 381 F.3d 984 (10th Cir. 2004), in which the Tenth Circuit upheld an officer's search of a container within a bag. See Tr. at 112:6-12 (Long). The United States also pointed to case law establishing that "a defendant's failure to limit the scope of a general authorization to search and failure to object when the search exceeds

what he later claims was a more limited consent is an indication that the search was within the scope of consent." United States v. Gordon, 173 F.3d 760, 766 (10th Cir. 1999).

Amador-Beltran entered into a plea agreement which waives her rights to appeal the conviction and any sentence within the statutory maximum authorized by law, with the exception that she reserves the right to appeal the denial of her motion to suppress. See Plea Agreement, filed July 23, 2015 (Doc. 49); Transcript of Hearing at 22:2-12 (taken November 6, 2015)(Court).

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d

1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)).   The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification,"

or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).  The inquiry is an objective one.  See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003).  "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity."  United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of

- 16 -

a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words.  "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal.  Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See 335 F.3d at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag.  See 173 F.3d at 765.  The officer then asked to see the suspect-train passenger's ticket and identification, inquired into his travel plans, and asked if he had any luggage.  See 173 F.3d at 765.  The officer did not inform the suspect that he was free to leave or not answer her questions.  See 173 F.3d at 765.  The officer asked to search the suspect's luggage and the suspect gave his consent.  She asked him whether he had any contraband, informing him that contraband was the subject of her search.  See 173 F.3d at 765.  When she encountered the suspect's locked bag, she asked him if he could open it.  See 173 F.3d at 765.  Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]."  173 F.3d at 766.  The Tenth Circuit concluded that the suspect's

"voluntary relinquishment of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage. See 173 F.3d at 766. The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include. See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995). The Tenth Circuit determines whether a search remains within the boundaries of the consent given based on the totality of the circumstances. See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996). When an officer tells a suspect the object of his search and the suspect consents to a search for that object within a certain area, the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any area within the confines of the officer's request where the object may be found. United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs"). See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that the search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the defendant consented to a search of his apartment for another

person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent."  United States v. Gordon, 173 F.3d at 766.  See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics).  Accordingly, in United States v. Gordon, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag" when the officer discovered it within his larger bags.  173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")).  The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."  173 F.3d at 766.

## ANALYSIS

Based on the totality of the circumstances indicating that Perry's behavior was not coercive, the Court concludes that Amador-Beltran freely and voluntarily handed Perry her sweater.  Furthermore, the Court concludes that she did not limit her consent to exclude items wrapped inside the sweater.  Accordingly, the Court denies Amador-Beltran's motion and will not suppress the illegal narcotics that Perry found inside her sweater.

## I.    AMADOR-BELTRAN GAVE PERRY CONSENT TO SEARCH HER SWEATER WHEN SHE HANDED IT TO HIM.

First, Amador-Beltran argues that she did not give Perry consent to search her sweater because the language barrier prevented her statements from being "consent" as the Supreme Court and Tenth Circuit define the word.  Consent must be "unequivocal and specific and freely

and intelligently given."  Motion at 9-10 (quoting United States v. Guerrero, 472 F.3d at 789).

Amador-Beltran contends that she did not give consent because Perry misunderstood her

answers.  See Motion at 10.  The relevant inquiry, however, is not whether Perry was a fluent

Spanish speaker, but whether Amador-Beltran was capable of understanding his questions and

voluntarily giving consent.  See United States v. Guerrero, 472 F.3d at 789-90.  The Court

concludes that she had that ability.

    Perry asked to search Amador-Beltran's bag, purse, and pillow before asking to search

her sweater.  In response to each request, Amador-Beltran complied and handed Perry the item

requested.  See Tr. at 23:22-23 (Perry); id. at 19:11-18 (Perry).  She understood that he was

asking for consent to search the item.  Following these exchanges, she handed Perry the sweater

in response to his question whether he could search what he thought was a blanket, but which

turned out to be a sweater.  See Tr. at 28:24-25 (Perry).  Like she had done with the other items,

she handed Perry the sweater knowing what he intended to do with it -- search it.  This conduct

communicated her consent to search the jacket, even if her verbal response was not in relation to

Perry's question whether he could search the sweater.  See United States v. Ringold, 335 F.3d at

1175 (concluding that an affirmative nod signaled consent); United States v. Gordon, 173 F.3d at

775-76 (concluding that the suspect gave consent, even though he failed to respond verbally,

when he handed a key to the officer in response to her asking him to open a bag to search it for

contraband); United States v. Guerrero, 472 F.3d at 789-90 (stating that a suspect may give

consent "through gestures or other indications of acquiescence").

    Second, Amador-Beltran contends that, if she consented to Perry's search, it was not

voluntary because her encounter was not consensual.  Although she complied with Perry's

requests, she states that she had no real choice because a reasonable person in her situation

would not have felt free to decline.  See Motion at 7-8.  Amador-Beltran cites Florida v. Bostick, 501 U.S. 421 (1991), to support her contention that she was not free to leave.  In Florida v. Bostick, however, the defendant could not leave because he was on a moving bus.  Amador-Beltran, in contrast, was on a bus still at the station.  Nevertheless, she maintains that Perry's behavior was threatening.  She states that, after making "small talk," he stood in the aisle -- blocking her exit -- and "demanded to see her ticket and her identification."  Motion at 8.  She argues that Perry's actions "would signal to any reasonable person that they were not free to walk away."  Motion at 8.

The controlling case law leads the Court to disagree.  The totality of the circumstances demonstrates that a reasonable person would have felt free to decline Perry's requests.  In United States v. Ringold, where officers encircled the defendant on all sides, the Tenth Circuit concluded that, even if the police officers positioned themselves in a way that indicated the suspects were not free to leave, that factor was only one factor among many and the other factors outweighed the officers' positioning.  See 335 F.3d at 1173.  Similarly, in United States v. Hill, 199 F.3d 1143 (10th Cir. 1999), the Tenth Circuit found that the totality of circumstanced demonstrated that the encounter was consensual.  There, the officer, who had a visible badge and gun, stood in the aisle at the rear of the passenger's seat, just like Perry.  See 199 F.3d at 1148. The officer, like Perry, asked questions about the suspect's travel itinerary and carry-on luggage, which the Tenth Circuit found "fail[ed] to support a conclusion of coercion."  199 F.3d at 1149. Even though the suspect argued that "he was more vulnerable to coercion by police officers, and more inclined to comply with police requests whether he really wanted to or not," as Amador-Beltran has argued in this case, the Tenth Circuit emphasized "that the particular personal traits or subjective state of mind of the defendant are irrelevant to the objective 'reasonable person'

test." 199 F.3d at 1149 (quoting United States v. Little, 18 F.3d 1499, 1504 (10th Cir. 1994)(en

banc)).   Finally, the Tenth Circuit stated that the officer's failure to specifically advise the

suspect of his rights to refuse to answer his questions did not render the encounter non-

consensual.   See 199 F.3d at 1149.   See also United States v. Anderson, 114 F.3d 1059, 1064

(10th Cir. 1997).

Finally, on facts similar to the ones at issue here, the Supreme Court concluded in United

States v. Drayton, 536 U.S. 194 (2002), that the totality of the circumstances demonstrated that

the encounter was consensual.   The Tenth Circuit in United States v. Thompson, 546 F.3d 1223

(10th Cir. 2008) described the case:

> [T]he defendants were passengers on a Greyhound bus that had stopped to refuel.
> Three police officers boarded the bus as part of a routine drug and weapons
> interdiction effort.   One officer stood at the back of the bus, one at the front, and
> the other next to or behind each passenger as he asked him questions.   The Court
> noted that the exits of the bus were not blocked.   When talking to the defendants,
> the officer stated his purpose and asked if they had any bags on the bus.   The
> officer obtained permission to search the defendants' bag, which revealed no
> contraband.   Noticing the defendants were wearing baggy clothes, he asked if he
> could check their persons.   Each permitted a pat down search, which revealed
> packages of drugs, and the officers arrested both defendants.   The Supreme Court
> held that because there was "no application of force, no intimidating movement,
> no overwhelming show of force, no brandishing of weapons, no blocking of exits,
> no threat, no command, [and no] authoritative tone of voice," and the encounter
> took place in the presence of other citizens, the interaction was consensual and no
> seizure had occurred.

546 F.3d at 1226.   Like in United States v. Ringold, United States v. Hill, and United States v.

Drayton, the totality of the circumstances support that a reasonable person would feel free to

leave.   Perry confronted Amador-Beltran in full view of the other passengers on a public bus, he

was not in uniform.   He did not display a firearm, he never touched or restrained her, he

maintained an even tone of voice, and he quickly returned her items to her after searching them.

See United States v. Fox, 600 F.3d at 1258 (concluding that courts should consider the following

- 22 -

in determining whether an encounter was consensual: (i) the absence of other members of the public; (ii) the display of weapons, and physical touching or restraining; (iii) the use of aggressive language or tone; (iv) the presence of several officers; and (v) the prolonged retention of a person's personal items).  Further, Perry did not block the exit; he stood to the rear of Amador-Beltran's seat.  See United States v. Fox, 600 F.3d at 1258 (directing courts to consider whether the officer blocked a person's exit in determining whether an encounter was consensual).  The totality of circumstances indicate that a reasonable person would have felt free to leave.  See United States v. Drayton, 536 U.S. at 207; United States v. Hill, 199 F.3d at 1149; See United States v. Fox, 600 F.3d at 1258.  Thus, this was a consensual encounter.  Amador-Beltran conceded that if she "voluntarily handed [the sweater] to him without any coercion, yes, I would think that that would be a nonverbal consent."  Tr. at 106:10-13 (Baiz).  Because the Court determines that Amador-Beltran handed Perry the sweater and the totality of the circumstances demonstrate that her consent was not coercive, it concludes that Perry had consent to search the sweater.

The Court notes that it listened carefully to Perry's Audio Recording, and reviewed the transcript of the conversation.  See Recording at 1-8.  Perry's tone was not hostile, intimidating, or coercive.  See Audio Recording.  Also, his story is consistent with the recording.  The sweater ended up in his hands, and while the Court does not have a video tape of that exchange, the Audio Recording and conversation support his version.  As Amador-Beltran admitted at the hearing, if Perry was not coercive, then she consented to the search.  See Tr. at 106:10-13 (Baiz)(conceding that if she "voluntarily handed [the sweater] to him without any coercion, yes, I would think that that would be a nonverbal consent") .

## II.   AMADOR-BELTRAN GAVE PERRY CONSENT TO SEARCH ALL ITEMS WITHIN HER SWEATER WHEN SHE HANDED HER SWEATER TO HIM.

Amador-Beltran next argues that, even if she gave Perry consent to search her sweater, the scope of her consent was limited to the sweater, i.e., her consent did not include the items inside the fanny pack wrapped inside the sweater.  See Reply at 2-3.  Tenth Circuit case law demonstrates the opposite.  The Tenth Circuit has held that "[t]he search of a container does not exceed the scope of consent when, under the circumstances of the particular case, it was objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to open the container."  United States v. Jackson, 381 F.3d at 988.

In United States v. Jackson, a case also involving Perry, Perry initiated a conversation similar to the one at issue with a train passenger.  See 381 F.3d at 987.  He asked the passenger "for consent to search his bag for contraband," and the passenger allowed it.  381 F.3d at 987.  Inside the passenger's bag, Perry found a shaving kit, similar to the fanny pack at issue here, containing a heavy container of baby powder.  See 381 F.3d at 987.  The Tenth Circuit noted that Perry could not examine the container's contents without opening its top, so he removed the lid and discovered illegal narcotics.  See 381 F.3d at 987.  Like Amador-Beltran does here, the passenger asserted that his consent to search the shaving kit did not include consent to search the contents of the items within the kit.  The Tenth Circuit concluded that the "baby powder container was within the scope of Jackson's consent to the search of his bag" because a reasonable officer would believe that the passenger's consent was not limited.  381 F.3d at 988. As support, the Tenth Circuit pointed to the passenger's failure to limit his consent at the outset, and his failure to object when Perry began to open the baby powder container.  See 381 F.3d at 988.  Moreover, "Agent Perry told [the passenger] that he wanted to search the bag for narcotics. Jackson's consent to the search of his bag for narcotics could be reasonably construed as consent

to search any containers within the bag which could have held narcotics."  381 F.3d at 988.

Just as in United States v. Jackson, Amador-Beltran provided Perry with the sweater, indicating her consent to search it.  Perry had already searched through the contents of Amador-Beltran's bag, purse, and pillow without objection.  She watched him search inside the bag and purse rather than examining their exterior alone.  She therefore knew that he would likely do the same with her sweater.  Despite this, she did not attempt to limit the scope of her consent or object to Perry's search of the fanny pack when he discovered it inside her sweater.  As the Tenth Circuit has stated, "a defendant's failure to limit the scope of a general authorization to search and failure to object when the search exceeds what he later claims was a more limited consent is an indication that the search was within the scope of consent."  United States v. Gordon, 173 F.3d at 766.  Thus, Perry had consent to search not only the sweater, but any containers inside the sweater.

Furthermore, like in United States v. Jackson, Perry told Amador-Beltran that he wanted to search her items for contraband, which includes narcotics.  Amador-Beltran's "consent to the search of [her] bag for narcotics could be reasonably construed as consent to search any containers within the bag which could have held narcotics."  United States v. Jackson, 381 F.3d at 988.  Here, Amador-Beltran knew that Perry was searching for contraband.  Accordingly, unless she limited her consent or stopped the search, Perry could search any place within the sweater where she might hide contraband.  See United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs"); United States v. McRae, 81 F.3d at 1538 (holding that the search did not exceed the scope of consent when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the

trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d at 553 (holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d at 1227 (holding that, because the defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

This case is distinct from United States v. Osage, where the Tenth Circuit required the officer to gain the suspect's explicit authorization because the containers were sealed so that opening them would destroy them. See 235 F.3d at 522. In United States v. Jackson, the Tenth Circuit distinguished United States v. Osage, stating that officers may search containers within a bag provided they do not destroy the container or render it completely useless. See 381 F.3d at 988-989. The container that Perry opened in United States v. Jackson remained capable of performing its designed function, so the search did not exceed the passenger's consent. See 381 F.3d at 989. Here, Perry did not destroy Amador-Beltran's fanny pack. Instead, he opened it easily using the zipper. Thus, Perry's opening of the fanny pack did not exceed the scope of Amador-Beltran's consent. In conclusion, Amador-Beltran freely consented to Perry's search when she handed him her sweater, and she did not limit her consent in any way. Thus, the Court denies her motion and will not suppress the evidence.

**IT IS ORDERED** that the Motion to Suppress Evidence Due to Violation of the Fourth Amendment, filed May 3, 2015 (Doc. 18), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
   United States Attorney
Shana B. Long
   Assistant United States Attorney
Albuquerque, New Mexico

   *Attorneys for the United States*

Sylvia Baiz
   Assistant Federal Public Defender
Albuquerque, New Mexico

   *Attorney for the Defendant*